THE HONORABLE ROBERT J. BRYAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ANN BEAHM,                                )
                                          )
                              Plaintiff,  )       No. C09-5048 RJB
                                          )
        v.                                )       ORDER DENYING IN PART AND
                                          )       GRANTING IN PART CITY
                                          )       DEFENDANTS' MOTION FOR
CITY OF BREMERTON, et al.,                )       SUMMARY JUDGMENT
                                          )
                              Defendants. )
                                          )
                                          )
_____   )

        This matter comes before the Court on City Defendants' Motion for Summary

Judgment (Dkt. 21).  The Court has considered the pleadings filed in support of and in

opposition to the motion and the remainder of the file herein.

## I. PROCEDURAL HISTORY:

        On January 16, 2009, Plaintiff Ann Beahm filed a Complaint in Pierce County

Superior Court against Defendants City of Bremerton, Kitsap County, Paul Lucas, Michael

Mecham, Angela Woods, Phil Williams, Robert Elsen, Maryellen Babbit, Sheree Jankowski

and Detective Rodney Harker. Dkt. 1. In her Complaint, Plaintiff states claims for

Defamation, Interference with a Contractual Relationship and Interference with a Business

ORDER Page 1

Expectancy, Malicious Prosecution, Wrongful Termination, Intentional Infliction of Emotional Distress, Federal Age Discrimination, Retaliation, Section 1983 Acting Under the Color of State Law to Extort, and Section 1983 Due Process Violations. Dkt. 33. On January 28, 2009, Defendants removed the case to this Court under 28 U.S.C. § 1441(b) due to Federal Question jurisdiction. Dkt. 1.

On December 18, 2009, all parties stipulated to a dismissal with prejudice of Defendant Kitsap County (Dkt. 17), and the Court granted this dismissal. Dkt. 18.

On January 28, 2010, all parties stipulated to a dismissal with prejudice of Defendant Michael Mecham (Dkt. 19), and the Court granted this dismissal. Dkt. 20.

On February 9, 2010, the remaining Defendants (collectively known as the "City Defendants") filed this Motion for Summary Judgment. Dkt. 21. The Motion for Summary Judgment seeks dismissal for all of Plaintiff's claims because the City Defendants argue that they had a lawful reason to terminate Plaintiff, namely this Plaintiff was paid for hours that she did not actually work. Dkt. 21.

On March 1, 2010, Plaintiff filed her Response to Defendant's Motion for Summary Judgment. Dkt. 33. She argues that summary judgment should not be granted because there are issues of fact remaining and the case should be presented to a jury. Dkt. 33. Plaintiff filed many exhibits and declarations with her Response, and some of pleadings were refiled as much as three times as duplicates. *See* Dkt. 45. These voluminous and duplicate pleadings made it difficult for this Court to prepare this Order, and Plaintiff's counsel should be cautioned to be careful in filing documents.

On March 5, 2010, the City Defendants filed a Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment. Dkt. 44. In this Reply, the City Defendants

ORDER Page 2

contend that within the pleadings submitted by the Plaintiff there is no evidence that "defendants inaccurately reported her arrival and departure from work." Dkt. 44 at 1. The City Defendants argue that for this reason their motion for summary judgment should be granted. Dkt. 44.

## II. RELEVANT FACTS:

### A. Plaintiff's Employment with City of Bremerton:

In 1977, Plaintiff began working for the City of Bremerton as an Office Assistant in the City's Accounting Division. Dkt. 24. In 1983, Plaintiff was transferred to the City's Police Department as an Office Assistant Senior. Dkt. 24. In 1999, Plaintiff transferred to the Engineering Division, which is a division of the Department of Public Works and Utilities ("PW&U"), as an Office Assistant Senior. Dkt. 24. Plaintiff worked at the Engineering Division for the City of Bremerton until August 16, 2007, when she was terminated for allegedly getting paid for hours that she did not actually work. Dkt. 21. Plaintiff contends that this reason was merely pre-text for discrimination. Dkt. 1.

While employed with the City of Bremerton, Plaintiff was represented by the Local Teamsters Union. Dkt. 29; Dkt. 34-1. Plaintiff's immediate supervisor was City Engineer Michael Mecham. Dkt. 34-1. During her employment with the City of Bremerton, Plaintiff "never received a single counseling, reprimand or disciplinary action for not living up to [her] responsibilities." Dkt. 34-1.

Plaintiff's job duties included scheduling and formatting "agenda bills" for meetings, preparing payroll records to be delivered to Human Resources Division for processing, and providing backup for Angela Woods, an Office Assistant II, which included answering telephone calls and assisting customers at the front counter. Dkt. 29; Dkt. 35-1. The

ORDER Page 3

Engineering Department expected Plaintiff and Ms. Woods to coordinate their breaks, lunch times and vacation so that one of them would be in the office at all times. Dkt. 29.

Over time Plaintiff's coworkers in the Engineering Department, including Ms. Woods, began to notice that Plaintiff was not in the office during core working hours. Dkt. 23; Dkt. 25; Dkt. 27; Dkt. 47; Dkt. 49; Dkt. 50; Dkt. 51; and Dkt. 52   Plaintiff's coworkers found it strange that she was out of the office so frequently, even when they factored in Plaintiff's sick leave and vacation time,. Dkt. 23; Dkt. 25; and Dkt. 27. Plaintiff's coworkers began to complain about the frequency at which Plaintiff was not at her desk and would jokingly ask "Where's Ann?" Dkt. 23; Dkt. 25; Dkt. 27; Dkt. 49; and Dkt. 52.

The Engineering Department employees, including Plaintiff, were represented by a union, and they had core hours that they were generally required to work, which were from 8:00 a.m. to 4:00 p.m. on weekdays. Dkt. 22. Engineering Department employees could deviate from this schedule slightly, but usually only under a special arrangement. Dkt. 22. Plaintiff states that she would begin her work day around 7:00 or 7:30 a.m. and would leave around 4:00 p.m. Dkt. 22.  Plaintiff asserts that on days she would start at 7:00 a.m. she would take an hour lunch, while on days she started work at 7:30 a.m. she would take only a half hour lunch. Dkt. 22.

The Engineering Department's policy was that if an office employee needed to work overtime, at home, on weekends or a shift that was not within the core hours, the employee was required to get approval from a supervisor. Dkt. 29 at 2.  In cases where the employee worked more than eight hours a day, the employee was required to get permission from a supervisor before doing so and record the extra hours worked either as overtime or earned compensatory time. Dkt. 29 at 2. Overtime is paid at time and a half, and earned

ORDER Page 4

compensatory time is time that can be used for leave on a later date. Dkt. 29. Plaintiff contends that she often took work home or worked on her own time in order to finish her job duties and, for most of those times that she took work home, Plaintiff took compensatory time so that the City of Bremerton would not have to pay her overtime. Dkt. 34-1. Plaintiff states when she needed to deviate from those hours she would make arrangements with Mr. Mecham, her supervisor. Dkt. 22; Dkt. 29.  Plaintiff asserts that there were several occasions where she had to work late but could not reach Mr. Mecham to get approval beforehand. Dkt. 22. On the other hand, Mr. Mecham states that it was extremely rare for Plaintiff's job duties to require her to take work from home, leave the office, or work on the weekends. Dkt. 29. Mr. Mecham recalls only a couple of occasions, in 2006 or 2007, where Plaintiff was authorized to take work home. Dkt. 29; Dkt. 35-7.

### B. Ms. Jankowski's Calendar Tracking Plaintiff's Time at Work:

In November 2006, Sheree Jankowski, an Engineering Technician, decided to informally track how much time Plaintiff was actually in the office "just out of pure curiosity." Dkt. 27; Dkt. 35-3. Ms. Jankowski recorded Plaintiff's arrival to and departure from the office on a paper calendar in her office. Dkt. 27. Ms. Jankowski states that if she did not see when Plaintiff arrived or left, she would ask Ms. Woods or Robert Elsen, who was an Engineer Technician, if they knew when; if they did not know Plaintiff's arrival or departure, Ms. Jankowski would leave that day blank on her calendar or mark it with a "?" mark if she was unsure. Dkt. 27. Ms. Jankowski's hours were from 7:30 a.m. to 4:00 p.m. Dkt. 35-3. Ms. Jankowski admits she did not know Plaintiff's core hours. Dkt. 35-3.

Mr. Elsen states that he participated by keeping track of Plaintiff's time in the office. Dkt. 35-5. Mr. Elsen asserts that he would look out his office window and see if Plaintiff's car

was in the parking lot and then report back to Ms. Jankowski for her to mark on the calendar.

Dkt. 35-5. Lynn Horish, a former Engineering Department employee, states that during the

time that Ms. Jankowski was tracking Plaintiff's time in the office, Ms. Horish would

typically see Plaintiff's car in the parking lot when she arrived in the morning. Dkt. 34-3. Ms.

Horish's working hours were from 7 a.m. to 4 p.m. Dkt. 34-3.

Ms. Horish states that she would usually go upstairs to the Engineering Division

usually three or four times a day and she always saw Plaintiff at her desk or talking to Mr.

Mecham. Dkt. 34-3.

On January 14, 2007, Plaintiff fell on ice in front of the Engineering Division and

injured her neck and hip. Dkt. 34-1. Plaintiff reported this incident to Paul Lucas,

Administrative Analyst for PW&U, who encouraged her to file a Labor and Industry Claim,

which Plaintiff did. Dkt. 34-1. Plaintiff maintains that this fall resulted in physician

appointments, medical testing and physical therapy, which caused her to be out of the office.

Dkt. 34-1. Bill Davis, an engineer, stated that he noticed Plaintiff was frequently out of the

office, but "assumed she was taking leave for health-related reasons due to a past accident."

Dkt. 47.

Ms. Jankowski states that she did not intend to give this information to management or

"to use it against [Plaintiff] in any way." Dkt. 27. Ms. Jankowski asserts that at first she did

not tell anyone about her decision to track Plaintiff's whereabouts, but then later told Ms.

Woods and Mr. Elsen about it in order to get their assistance in tracking Plaintiff's time in the

office. Dkt. 27.

On March 1, 2007, Ms. Jankowski gave a copy of the calendar to Maryellen Babbit, an

Engineering Technician and the Union Steward within the Engineering Department. Dkt. 27;

ORDER Page 6

Dkt. 35-3. Ms. Jankowski states that she gave Ms. Babbit the calendar because Ms. Babbit asked Ms. Jankowski if she had any information showing what times Plaintiff had been in the office. Dkt. 35-3; Dkt. 27; Dkt. 28.  Ms. Babbit contends that Ms. Jankowski and Mr. Elsen came to her and expressed their concern about Plaintiff's hours because they had seen the "lead balances," which are the balances at the end of each pay period that show sick leave and vacation; this conversation lead to Ms. Babbit's request for a copy of the calendar. Dkt. 35-7.

Shortly after getting the calendar, Ms. Babbit informed Paul Lucus, Administrative Analyst for PW&U, that she and other employees in the Engineering Division were concerned that Plaintiff frequently did not work her entire shift. Dkt. 28. Ms. Babbit states that Mr. Lucas handles the disciplinary actions for the Public Works Department including the "follow-through," the investigation and sits in on disciplinary hearings. Dkt. 35-7. Jane Rebelowski, one of Plaintiff's co-workers, contends that the Plaintiff had a contentious relationship with Ms. Babbit. Dkt. 35-1.  Ms. Rebelowski alleges that Ms. Babbit told that "she shouldn't trust [the Plaintiff], and that Plaintiff had refused to join the union and pay union dues." Dkt. 35-1.  Ms. Babbit states that she did not go talk to Mr. Mecham, Plaintiff's supervisor, about the calendar or her concerns about Plaintiff's whereabouts. Dkt. 35-3. Mr. Mecham states that no one approached him with concerns about Plaintiff's hours and, if anyone had, he would have spoken to Plaintiff about it. Dkt. 35-7.

In April 2007, Mr. Lucas spoke with Phil Williams, Director of Public Works and Utilities for the City of Bremerton, about Plaintiff allegedly getting paid for time she did not work. Dkt. 35-1; Dkt. 32. Mr. Lucas contends that Mr. Williams told him to "dig deeper, dig into it." Dkt. 35-1. Mr. Williams states that he told Mr. Lucas that "he should get payroll documents and look into the employee's concerns to see if they have any merit." Dkt. 32.

ORDER Page 7

Mr. Lucas states that he first examined the payroll sheets from November 2006 to April 2007 and compared the dates where there was a question of whether the Plaintiff worked that time. Dkt. 35-1 at 13.  Mr. Lucas states that he checked the alarm information records for the PW&U building in order to see if Plaintiff was working late or starting work early by arming or disarming the alarm system. Dkt. 28. Mr. Lucas states that even under the most conservative estimate Plaintiff reported 184.75 hours that she did not in fact work. Dkt. 28. Mr. Lucas declares that he never checked, prior to Plaintiff's suspension, with Mr. Mecham, Plaintiff's supervisor, to determine what her schedule was or whether Plaintiff was allowed to take work home. Dkt. 35-1. Mr. Williams states that after Mr. Lucas's initial investigation he decided to conduct a formal investigation and put Plaintiff on Administrative Leave. Dkt. 32.

Plaintiff filed voluminous pleadings in order to show that other Engineering Department employees would frequently take long breaks or use on-the-job time for personal projects or calls. Linda Shafer, one of Plaintiff's co-workers, contends that Mr. Elsen would frequently take long personal calls at the office and that Mr. Lucas slept in his office. Dkt. 34-2. Ms. Rebelowski states that Mr. Lucas would sleep in his office. Dkt. 35-1.  Ms. Horish contends that the "entire engineering staff takes long breaks and lunches and goes home early, especially on Fridays, so it's commonplace for people to be gone in Engineering." Dkt. 34-4. Ms. Horish states that she thought that to single out the Plaintiff was "kind of ludicrous" because the entire department was "doing that." Dkt. 34-4. Ms. Rebelowski contends that Ms. Jankowski and Ms. Woods would frequently use their work computer for personal projects. Dkt. 35-1. Ms. Rebelowski asserts that Mr. Elsen would have personal telephone conversations at work, would read the newspaper and would watch television in the

ORDER Page 8

conference room on occasion. Dkt. 35-1.  Ms. Rebelowski contends that other employees within the Engineering Division had what they called "Real Estate Club" where they would spend time on the job discussing potential real estate deals and would look at real estate listings on City computers. Dkt. 35-1.

### *C. Plaintiff's Suspension and Subsequent Termination:*

On May 18, 2007, Plaintiff received a telephone call from Managing Engineer Larry Matel. Dkt. 34-1.  Plaintiff states that in this call Mr. Matel told Plaintiff that Mr. Williams wanted to meet her in his office. Dkt. 34-1. When Plaintiff went into Mr. Williams' office, Mr. Williams, Mr. Lucas, Assistant City Attorney Ken Bagwell and John Witte, whose position was not mentioned, were present. Dkt. 34-1. Plaintiff states that Mr. Williams informed her that there had been some payroll discrepancies and that Plaintiff was being placed on Administrative Leave pending further investigation. Dkt. 34-1. Plaintiff contends that this claim surprised her. Dkt. 34-1. Mr. Lucas admits that Plaintiff was never counseled that there were issues with her hours prior to her suspension or termination from the Engineering Department or spoke with her supervisor Mr. Mecham. Dkt. 35-1.

On May 18, 2007, Mr. Mecham learned that Plaintiff was placed on Administrative Leave while an investigation was pending concerning Plaintiff's reports on the hours she worked. Dkt. 29. At this time, Mr. Williams interviewed Mr. Mecham. Dkt. 29; Dkt. 32. Mr. Williams also interviewed Ms. Babbit. Dkt. 23; Dkt. 32. Ms. Babbit states that she told Mr. Williams that she "had noticed that [Plaintiff] had been out of the office more than [she] would have expected." Dkt. 23.  Mr. Lucas states that Ms. Babbit's "cubicle is removed from where she would be able to physically see [Plaintiff's] coming and goings on a regular basis." Dkt. 35-1.

ORDER Page 9

Mr. Williams also interviewed Mr. Elsen. Dkt. 25; Dkt. 32. Mr. Elsen states that he told Mr. Williams that he noticed Plaintiff was out of the office frequently and that Ms. Jankowski would ask him when Plaintiff arrived or departed. Dkt. 25. Ms. Jankowski was also interviewed by Mr. Williams, who told him that she had kept a calendar of Plaintiff's arrival and departure from work. Dkt. 27; Dkt. 32.

Mr. Williams states that on July 19, 2007, he sent Plaintiff a proposed termination letter. Dkt. 32. Mr. Williams contends that in that letter he informed Plaintiff that a pre-disciplinary hearing was scheduled for July 25, 2007, and that Plaintiff could respond to the charges in person or by letter. Dkt. 32. Mr. Williams states that Plaintiff's attorney, Clayton Longacre, requested a continuance of the pre-disciplinary hearing and the hearing was rescheduled to August 10, 2007.[1] Dkt. 32. Plaintiff contends that she requested a continuance because she needed an opportunity to gather the items requested and time to review the materials. Dkt. 36-1.

On August 2, 2007, Plaintiff's physician, Dr. Arunas T. Banionis, wrote a letter stating that Plaintiff was being treated for depression and anxiety and "that it would be reasonable to request a least a four-week postponement of this hearing" in order for new medication to take effect. Dkt. 36-1. Plaintiff's attorney, Mr. Longacre, sent Dr. Banionis's letter to the City of Bremerton and requested a continuance on August 8, 2007. Dkt. 36-1.

On August 9, 2007, Assistant City Attorney Ken Bagwell declined to continue Plaintiff's pre-disciplinary hearing, because "while the doctor believes that [Plaintiff] may be

---

[1] The Court recognizes that Mr. Longacre is Plaintiff's attorney in this present action and is unsure what implication Mr. Longacre's involvement as a witness in the investigation and hearing process will have on his ability to continue to act as counsel in this case if this proceeds to trial.

ORDER Page 10

able to make a better presentation several weeks from now, the doctor does not state that she is incapable of attending the scheduled pre-disciplinary hearing." Dkt. 36-1.

On August 10, 2007, Plaintiff's attorney, Mr. Longacre, sent another letter in which he argues for a continuance and states that Plaintiff cannot attend because her physician "will not allow her to undergo the stress of a hearing with you," and that Plaintiff has not had access to all the evidence to be used against her. Dkt. 36-1.

Mr. Williams maintains that Plaintiff did not respond either in person or in writing to the August 10 pre-disciplinary hearing and that he sent her a Notice of Discipline informing her that she has been formally terminated on August 17, 2007. Dkt. 32. Plaintiff did not appeal her Notice of Discipline. Dkt. 24.

### *D. Criminal Charges against Plaintiff:*

Mr. Williams states that after his internal investigation of Plaintiff he met with Assistant City Attorney Ken Bagwell and Human Resources manager Carol Conley. Dkt. 32. Mr. Williams contends that Mr. Bagwell told him that Plaintiff's conduct could be criminal. Dkt. 32. Mr. Williams maintains that he was surprised by this statement and did not intend or expect his investigation into Plaintiff's hours to be turned into a criminal investigation. Dkt. 32.

On June 6, 2007, Detective Rodney Harker was assigned to investigate Plaintiff for theft. Dkt. 26. Detective Harker states that he met with Captain Burchett, City Attorney Ken Bagwell, Phil Williams and Paul Lucus, and that Mr. Williams and Mr. Lucus had conducted an initial investigation into Plaintiff's alleged theft. Dkt. 26.

Detective Harker states that he reviewed a "document prepared by Paul Lucas that compared the hours [Plaintiff] reported she worked with the hours that her co-workers

ORDER Page 11

observed her at work." Dkt. 26. Detective Harker asserts that he prepared two different

comparisons of the hours worked by Plaintiff. Dkt. 26. Detective Harker maintains that on the

first comparison of Plaintiff's reported hours and the calendar kept by Ms. Jankowski he

found that Plaintiff reported working 153 hours more than she actually worked. Dkt. 26.

Detective Harker contends that on his second more conservative comparison, which gave

Plaintiff the benefit of the doubt, Plaintiff reported working 112.75 hours she did not actually

work. Dkt. 26.

Detective Harker contends that during the investigation he learned that Plaintiff may

have been disciplined ten years earlier for similar behavior in the Police Department. Dkt. 26.

Detective Harker states that he interviewed Sergeant Kevin Crane on June 14, 2007. Dkt. 26.

Detective Harker asserts that during this interview he learned that coworkers reported that

Plaintiff was out of the office a lot, and confronted her about it. Dkt. 26. Detective Harker

states that she allegedly responded that she was working outside the office for Captain Craig

Rogers or working at home. Dkt. 26. Detective Harker maintains that Sergeant Crane said that

he kept track of Plaintiff's time on a calendar and later turned that calendar over to the union

representative. Dkt. 26. Detective Harker interviewed Captain Rogers who stated that

Sergeant Crane did provide him with a calendar but he believed that the incident was hard to

prove and that Plaintiff put in for a transfer. Dkt. 26.

Detective Harker states in his report that he checked with Mr. Lucas who looked in

Plaintiff's personnel file and found no record of discipline after the Police Department

investigation. Dkt. 26. Furthermore, Captain Rogers stated in a November 23, 1998 memo to

Roy Alloway that after "[a] review of payroll records, time sheets and personal documents

along with several interviews were made and reviewed and it has been determined that this

ORDER Page 12

conduct [Plaintiff allegedly reporting hours she did not work] has been exonerated." Dkt. 36-4. Detective Harker states that he "was not aware" that Captain Rogers had sent a letter completely exonerating Plaintiff. Dkt. 45.

Detective Harker states that on June 20, 2007, he called Plaintiff and tried to get an interview with her, and she responded that she wanted to talk to her lawyer first. Dkt. 26.

Detective Harker asserts that he submitted the Certificate of Probable Cause and his report to the Kitsap County Prosecuting Attorney's Office on June 27, 2007. Dkt. 26. Detective Harker contends that he "was not pressured or in any way influenced by any City employee, including members of the Police Department, to conduct a criminal investigation or [to] forward the results of [his] investigation to the prosecuting attorney's office." Dkt. 26.

On August 3, 2007, Plaintiff was charged with Second Degree Theft in Kitsap District Court. Dkt. 34-1.

On August 30, 2007, Plaintiff appeared in District Court where she did not accept an offer to participate in the Felony Diversion program and the case was moved to Kitsap Superior Court. Dkt. 34-1.

On September 11, 2007, Plaintiff was charged with Theft in the Second Degree in Superior Court. Dkt. 34-1.

On October 1, 2007, Plaintiff was arraigned in Superior Court and was placed in handcuffs in front of the entire court room, was taken down the hall for a "pat down," and was then taken to the jail area where she was told to remove her jewelry, shoes and jacket and another "pat down" was conducted. Dkt. 34-1. Plaintiff had her fingerprints and photograph taken and was placed in a jail cell, where she states that she "sat crying for about an hour." Dkt. 34-1. Plaintiff states that this "incident caused her a great deal of humiliation, fear,

ORDER Page 13

nightmares and anguish." Dkt. 34-1. On Plaintiff's arraignment documents, it states that the "Court finds Probable Cause." Dkt. 45 at 4.

On January 4, 2008, the Kitsap County Prosecutor's Office reviewed Plaintiff's case and the charges were amended to First Degree Theft in Kitsap County Superior Court. Dkt. 34-1.

On May 2, 2008, the Kitsap County Superior Court case against the Plaintiff was dismissed and re-filed in Kitsap County District Court as misdemeanor charges of four counts of Third Degree Theft. Dkt. 34-1.

Plaintiff states that on December 2, 2008, "all charges were Dismissed against [her] because she proved the charges against her were false." Dkt. 34-1. It is unclear from the record why the charges against Plaintiff were dismissed.

### *E. Mr. Williams' Conversation with Ms. Rebelowski:*

Ms. Rebelowski contends that, sometime during the first two-weeks of August, Mr. Williams called Ms. Rebelowski into his office and asked her if she would talk to Plaintiff because Mr. Williams knew that they were friends. Dkt. 35-1. Ms. Rebelowski states that in their conversation they allegedly discussed the fact that "there is no way that [Ms. Jankowski] could see anybody coming up the stairs or going in the hallway, until they passed her desk." Dkt. 35-1 at 3.

Ms. Rebelowski asserts that she and Mr. Williams also discussed whether Mr. Elsen could hear when Plaintiff would come up and down the stairs at work, and Ms. Rebelowski states that she told Mr. Williams that it was unlikely that Mr. Elsen could identify footsteps because he frequently had his telephone calls on speaker phone and listened to the radio. Dkt. 35-1. Ms. Rebelowski contends that Mr. Williams told her that Mr. Lucas did a "thorough

ORDER Page 14

investigation" and that when Plaintiff "worked at the police department, his investigation shows [Plaintiff] stealing time from the police department, and the only reason that [Plaintiff] was not fired is that she found somebody in the engineering department at the same pay grade, who was willing to switch positions, so she switched." Dkt. 35-1.

Ms. Rebelowski states that Mr. Williams asked her to go and speak with the Plaintiff and to let the Plaintiff know that if she "just repays the city for the small portion that we can prove, the Kitsap County Prosecutor's Office can probably make this case go away." Dkt. 35-1. Ms. Rebelowski maintains that Mr. Williams told her that "the Kitsap County Prosecutor's Office is well-known for their strong prosecution of people stealing public funds," and that he would "consider it a personal favor if [she] went and talked to [Plaintiff], and asked her if she would consider this, and we can just make this all go away." Dkt. 35-1.  Ms. Rebelowski states that ten minutes after their conversation ended and she left Mr. Williams' office she was on her way to Plaintiff's home, and Mr. Williams called her and asked if she was going to talk to Plaintiff. Dkt. 35-1. Ms. Rebelowski states that she replied that she was on her way over. Dkt. 35-1. Plaintiff states that Ms. Rebelowski did come speak with her and her husband that evening. Dkt. 34-1. Ms. Rebelowski asserts that Plaintiff said "there's no way, why would I do that, why would I pay for something I didn't do." Dkt. 35-1.

### F. Kitsap Sun Publishes Newspaper Article on Plaintiff's Termination:

After Plaintiff's termination and on September 16, 2007, a newspaper article titled "City Worker Accused of Felony Theft" was published in the Kitsap Sun. Dkt. 36-1; Dkt. 34-1. The article states that "[a] 30-year Bermerton employee was charged with second-degree theft in Kitsap County Superior Court for allegedly getting paid by the city for hours she didn't work." Dkt. 36-1. The article identifies Plaintiff by name in the sub-heading of the

ORDER Page 15

article. Dkt. 36-1. Plaintiff argues that if someone were to conduct an internet search on her name "Ann Beahm" and "Bremerton, WA" the article is the first search result. Dkt. 36-1. The City Defendants deny any responsibility or contribution to the newspaper article. Dkt. 44 at 7.

Ms. Horish contends that Mr. Lucas wanted everyone to know about Plaintiff's alleged theft. Dkt. 34-3. Ms. Horish asserts that Mr. Lucas told someone to copy the article and to give it to Mr. Williams and that "he made sure everyone in the office knew." Dkt. 34-4. Ms. Horish contends that Mr. Lucas "made copies [of the article] for upstairs too." Dkt. 34-4. Ms. Horish maintains that Mr. Lucas seemed to imply that Plaintiff deserved to be arrested and charged with theft and that he may have used the phrase "it took a long time coming." Dkt. 34-4. Ms. Horish states that Mr. Lucas would talk in his office about how Plaintiff was "dishonest" and then would quickly shut the door. Dkt. 34-4. Ms. Horish asserts that Mr. Lucas would also talk around the office to other employees about how "dishonest" Plaintiff was and how he could not wait until the news article would come out. Dkt. 34-4. Ms. Horish alleges that she would over hear Mr. Lucas and Mr. Williams discussing Plaintiff's past trouble with the Police Department and that Plaintiff "was guilty and she got caught." Dkt. 34-4. Ms. Horish states that Mr. Lucas would also repeat this claim to Mr. Mecham. Dkt. 34-4. Ms. Horish maintains that Mr. Lucas continued to talk once or twice about the accusations at the Police Department even after the charges against Plaintiff were dropped. Dkt. 34-4.

Linda Fulton, an Engineering Department employee who was hired on in May 2007, states that she overhead conversations about Plaintiff even after her termination. Dkt. 36-1. Specifically, Ms. Fulton contends that she overheard Ms. Woods, Ms. Jankowski, Kathy (her last name is unknown) and Mr. Elsen discuss Plaintiff's alleged theft. Dkt. 36-1. Ms. Fulton declares that she only overheard "vague" information about the ongoing case. Dkt. 36-1.

ORDER Page 16

*G. Plaintiff's Replacement is Ms. Woods:*

Upon Plaintiff's suspension, Ms. Wood was immediately put into Plaintiff's position on a temporary basis, even though Ms. Horish states that she volunteered to take on Plaintiff's payroll duties because she was concerned that Ms. Woods would be "working outside of classification." Dkt. 34-3. Ms. Horish also states that there was talk around the office that Ms. Woods would be a "shoe-in" [*sic*] for Plaintiff's position. Dkt. 34-3. Ms. Horish contends that Ms. Woods came to talk to Mr. Lucas, who kept his door open during this conversation, and called Rob Tomlinson, a Human Resources Civil Service Officer, on speakerphone and Mr. Tomlinson said that there were 20 applicants for Plaintiff's position but Ms. Woods "would be in the top five and there would be no problem, she'd be a shoe-in [*sic*] for the job." Dkt. 34-3.

Charlotte Belmore, Human Resources Analyst for the City of Bremerton, states that the process used to fill Plaintiff's former position was the standard process. Dkt. 48 at 2. This process includes advertising the position and all applicants were required to submit an application and test for the position. Dkt. 48 at 2. Two City employees who have similar positions outside the PW&U Department scored the applications. Dkt. 48 at 2. The City Service Officer "tallied the application score" after proficiency and oral examinations and created an Eligible Register for the position. Dkt. 48. Ms. Belmore states that Ms. Woods "ranked number one, so her name was among the three applicants forwarded to Mr. Williams." Dkt. 48.

Mr. Mecham states that the City of Bremerton opened the Office Assistant Senior position vacated by Plaintiff's termination in 2007. Dkt. 53. Mr. Mecham maintains that he "was involved in the hiring process, but not until the Human Resources Department provided

ORDER Page 17

the Public Works and Utilities Department with the top three applicants for the position." Dkt.

53. Mr. Mecham contends that he "was asked to interview all three applicants and to provide

Phil Williams with a recommendation of who should be offered the position." Dkt. 53. Mr.

Mecham states that the top three applicants included two city employees, who did not work in

the Engineering Department, and Ms. Woods. Dkt. 53. Mr. Mecham asserts that he and the

two other City employees assisting in the interviews determined that Ms. Woods was the best

candidate. Dkt. 53.  Mr. Mecham states that Mr. Lucas was not involved in the hiring process

in any manner. Dkt. 53.

### *H. Mr. Lucas and Mr. Williams Allegedly Discriminated Against Plaintiff:*

Plaintiff initially met Mr. Lucas when she transferred to the PW&U Department in

January 1999. Dkt. 34-1. Plaintiff asserts that not long after meeting Mr. Lucas she noticed

that Mr. Lucas "appeared to be interested in the younger women who worked for the city."

Dkt. 34-1. Plaintiff's relationship with Mr. Lucas was described as contentious; specifically,

Ms. Rebelowski states that Mr. Lucas disliked how Plaintiff would question Mr. Lucas and

other engineers as to how they would turn in items for "agenda bills." Dkt. 35-1.  Ms.

Rebelowski contends that Mr. Lucas had "a vendetta against [the Plaintiff]." Dkt. 35-1.

It appears that Mr. Lucas had some knowledge of the issue of Plaintiff's hours in the

Police Department. Mr. Lucas wrote in a Memorandum for the Record that "[t]he perception

of payroll discrepancies was first brought to my attention shortly after [Plaintiff] reported

from the Police Department," and that he could not remember who told him but he "was told

that she had left Police because of an investigation into payroll discrepancies." Dkt. 36-3.

Mr. Lucas states that shortly after Plaintiff came to work in the Engineering

Department Steve Kindred, an Office Assistant in that department, "mentioned to [him] many

ORDER Page 18

times that [Plaintiff] was in and out a lot, taking longer breaks than she should, taking longer lunch breaks than she should, and he was – told [Mr. Lucas] he was going to keep a log of her comings and goings." Dkt. 35-1. Mr. Lucas asserts that Mr. Kindred left his employment with the City before he gave Mr. Lucas any log of Plaintiff's time. Dkt. 35-1. Mr. Lucas admits he never spoke with Mr. Mecham, or any other supervisor, concerning Mr. Kindred's concern that Plaintiff was out of the office a lot. Dkt. 35-1.

Ms. Shafer, who was an Office Assistant II in the Engineering Department, states that three or four months after she began her employment with the Engineering Division Mr. Lucas called Ms. Shafer into his office and "launched into an attack on [Plaintiff]." Dkt. 34-2; Dkt. 34-1. Ms. Shafer contends that Mr. Lucas asked if she had "noticed [Plaintiff] coming late or leaving early" or if she had "noticed [Plaintiff] making extensive personal phone calls or being on E-mail." Dkt. 34-2. Ms. Shafer alleges that Mr. Lucas told her that "other employees had never been able to get along with her, people who had been in [Ms. Shafer's] position, and that she had always saddled them with her work." Dkt. 34-2.  Ms. Shafer asserts that Mr. Lucas asked her to report to him if Plaintiff behaved inappropriately. Dkt. 34-2. Ms. Shafer states that she told Mr. Lucas that his request was "completely unprofessional" and refused. Dkt. 34-2.

In 2006, Mr. Lucas asked Ms. Woods to keep track of Plaintiff's coming and goings. Dkt. 34-1. Ms. Woods states that she declined this task because she was uncomfortable with it as a new employee still on probation. Dkt. 34-1; Dkt. 35-2. Ms. Woods states that Mr. Lucas asked her a second time whether she would track Plaintiff's time and Ms. Woods said that she would not. Dkt. 35-2. Ms. Woods asserts that she did not speak with Mr. Mecham who was in her chain of command about Plaintiff's time away from the office or Mr. Lucas's request to

ORDER Page 19

keep track of Plaintiff's time. Dkt. 35-2. Ms. Horish states that Plaintiff and Ms. Woods were having trouble getting along and that Ms. Woods would speak to Mr. Lucas frequently. Dkt. 34-3.

Ms. Shafer asserts that Mr. Lucas helped Kelsey Donleycott, a former PW&U employee, secure a job within the department by rewriting a job description to fit Ms. Donleycott's abilities after she allegedly failed the city-administered test for the position. Dkt. 34-2. Ms. Shafer states she believes that Mr. Lucas was trying to get Ms. Donleycott hired, but she was unsure if Mr. Lucas's motivation was because Ms. Donleycott was a younger woman. Dkt. 34-2. Ms. Horish states that Ms. Donleycott is twenty-nine years old. Dkt. 34-3.

Ms. Horish states that Mr. Lucas tried "to get [Ms. Donleycott] and [Ms. Shafer] promoted for quite some time," and that he sought outside help to help them rewrite their resumes. Dkt. 34-3. Ms. Rebelowski also states that Mr. Lucas would "brag" that he was responsible for getting Ms. Donleycott a promotion. Dkt 35-1.

Ms. Shafer states that Mr. Lucas kept Ms. Horish on a "very short leash," while Ms. Donleycott was allowed a flexible schedule. Dkt. 34-2. Ms. Shafer contends that Mr. Lucas allowed Ms. Donleycott to "pretty much get away with murder," while Ms. Horish was "very afraid of…getting in trouble all the time." Dkt. 34-2. Ms. Shafer states that she got "the impression that [this] was an age issue, but [she] never said anything to anybody." Dkt. 34-2. Ms. Shafer alleges that Mr. Lucas's mistreatment of Ms. Horish was because of her age, but Ms. Shafer admits she never heard Mr. Lucas make any statements to Ms. Horish about her age. Dkt. 34-2.  Ms. Shafer contends that also involved in this allegedly inequitable treatment was Mr. Williams and Gene Sampley (whose position is not identified). Dkt. 34-2.

Ms. Horish asserts that Mr. Williams "is a very busy man," and that he "relies on his managers to provide him information." Dkt. 34-3. Ms. Horish contends that Mr. Williams and Mr. Lucas had a close working relationship and that she "believe[s] [that Mr. Williams] believed everything that [Mr. Lucas] said and every evidence that [Mr. Lucas] provided." Dkt. 34-3.

Ms. Horish asserts that the City of Bremerton would discriminate against older women by taking assignments away from the older women and giving the assignments to younger women, inviting younger women to special meetings, or being friendlier to the younger women. Dkt. 34-3. Ms. Horish contends that both Mr. Lucas and Mr. Williams treated her differently because of her age. Dkt. 34-3. Ms. Horish alleges that "[t]hey have given a lot of [her] work away to younger people." Dkt. 34-3. Ms. Horish contends that she believes that older female employees are pushed out the door to retirement or "just to get rid of them in some way" in order to replace the older women with younger women. Dkt. 34-3.

Ms. Rebelowski states that she believed that Mr. Lucas wanted to replace Plaintiff with Ms. Woods because of "the harsh way he would speak to [Plaintiff], and his constant talking of how great [Ms. Woods] was, and the inordinate amount of time he spent at [Ms. Woods's] desk." Dkt. 35-1. Ms. Rebelowski contends that Mr. Lucas was "so excited" when Ms. Woods interviewed for her previous position and "would comment on how beautiful her clothes were." Dkt. 35-1 Ms. Rebelowski states that Mr. Lucas "was flirting with [Ms. Woods]." Dkt. 35-1. Ms. Rebelowski asserts that Mr. Lucas "likes compliant young women." Dkt. 35-1.

Plaintiff filed a claim with the EEOC in December 2007. Dkt. 44 at 2.

*I. Plaintiff Continues to Seek Other Employment:*

ORDER Page 21

Plaintiff alleges that she has been unable to get other employment because she "was wrongfully terminated." Dkt. 22. Plaintiff states that she believes that some of the companies where she applied for employment have contacted the City of Bremerton and likely the City gave "poor responses." Dkt. 22. Plaintiff also states that on the applications for employment she has had to indicate that she has been terminated from her former position. Dkt. 22. Plaintiff asserts that she has applied for employment for over a year with "at least three employers a week" without any success of finding a job. Dkt. 22.

## III. ANALYSIS:

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56 (c).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead to a rational trier of fact to find for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (non-moving party must present specific, significant probative evidence, not simply "some metaphysical doubt.").  See also Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987)

The determination of the existence of a material fact is often a close question.  The

ORDER Page 22

court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson,* 477 U.S. at 254, *T.W. Elect. Service Inc.,* 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.,* 809 F.2d at 630 (relying on Anderson, supra). Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### A. Defamation

The four elements of a prima facie case of defamation are: "falsity, an unprivileged communication, fault, and damages." *LaMon v. Butler*, 112 Wn.2d 193, 197 (1989). A plaintiff can defeat a summary judgment motion on the issue of defamation by presenting "specific, material facts" sufficient to support the existence of each element; namely, (1) falsity of the communication; (2) lack of privilege; (3) fault; and (4) damages. *Mohr v. Grant*, 153 Wn.2d 812, 821-22 (2005). The falsity prong is satisfied with evidence that a statement is provably false or leaves a false impression. *Mohr*, 153 Wn.2d at 825. In a defamation by omission case, defamation plaintiffs must show that the statement left a false impression that would be contradicted by the inclusion of omitted facts. *Id.* at 827. Evidence that favorable facts or facts that should or could have been included is insufficient to demonstrate falsity. *Id.*

ORDER Page 23

Plaintiff alleges that individual City Defendants made several defamatory statements about her honesty. Dkt. 33. Plaintiff presents enough to support her contention that these statements are arguably false.

City Defendants argue that they are entitled to qualified privilege, which exists "when it concerns a matter in which the publisher has an interest and is made to another who it is reasonably believed has a corresponding interest." *Messerly v. Asamera Minerals, Inc.*, 55 Wn. App. 811, 817-18 (1989) *overruled on other grounds by Swanson v. Liquid Air Corp.*, 118 Wash.2d 512 (1992). City Defendants state that "[c]ourts have applied this privilege to communications between coworkers, reporting another employee's misconduct." Dkt. 21. Although it is likely that some of these statements were made during the course of the investigation, the facts are disputed as to which defendant made what allegedly defamatory statements and when the defendants made these statements; specifically, Plaintiff argues that some defendants made statements about her after her employment with the City had been terminated. For this reason, qualified privilege may not apply to all statements. Therefore, the Court should not grant summary judgment on the issue of defamation. Factual issues about particular statements will be governed by the rules of evidence as to admissibility.

### B. Interference with Business Relationship

A claim of tortious interference with a contractual relationship or business expectancy has five elements:

> (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Pacific Northwest Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 351 (2006).

ORDER Page 24

As to the first element, "Washington law has not yet addressed the question of whether a public employee enjoys a contractual relationship or business expectancy in future employment." *See* 16A Wash. Prac. Series § 22.2, Interference with contractual relations--Overview (2009). Here, Plaintiff was an employee of the City, and she arguably had an interest in her continued employment with the City; and the City Defendants do not appear to dispute this.

Plaintiff alleges two instances of tortious interference with a valid contractual relationship or business expectancy. Plaintiff argues that the first claim concerns when City employees, including Ms. Babbit, Ms. Jankowski, Mr. Elsen, Ms. Woods and Mr. Lucas, allegedly interfered with her continuing employment with the City of Bremerton. Dkt. 33.

City Defendants contend that "a plaintiff must show that the interferor was an intermeddling third party; a party to the relationship cannot be held liable for tortuous interference," and that the City's employees as its agents are cannot be held liable. *See Vasquez v. State , Dept. of Social and Health Services,* 94 Wn. App. 976, 989 (1999). However, Plaintiff cites to *Eserhut v. Heister*, 52 Wn. App. 515 (1989), which states that an employee could bring an individual claim against coworkers for intentional interference with a contractual relationship.

It is unclear from the record whether Plaintiff brings this claim against the City Defendants as individuals, but in the interest of fairness and determining an outcome on the merits, the Court will assume that the Plaintiff does name the City Defendants as individuals. Here, the City Defendants argue that they are the employer's agents and cannot be held liable under this claim; however, the court in *Vasquez* only stated that there were insufficient facts to hold the individual employees liable in that case, and the court did not state that other co-

ORDER Page 25

workers cannot be liable for tortious interference with an existing employment contract. *See*

*Vasquez,* 94 Wn. App. at 990.

In this case, issues of fact exist whether the City Defendants intentionally interfered

with Plaintiff's continued employment with the City for an improper purpose. Defendants

argue that they did not intentionally interfere with Plaintiff's continuing employment with the

City, but merely recorded and reported what they thought was wrongdoing. Dkt. 44 at 13.

However, Plaintiff provided evidence to show a genuine issues of material fact whether City

Defendants intentionally interfered with her employment and whether it was for an improper

purpose . *See* Dkt. 34-1; Dkt. 34-2, Dkt. 34-3 and Dkt. 35-1. For this reason, City Defendants'

motion for summary judgment on Plaintiff's first claim of tortious interference with a

contractual relationship should not be granted.

Plaintiff's second claim concerns the same individuals, and Detective Harker and Mr.

Williams. Dkt. 33. Plaintiff argues that these defendants "distorted" her employment record,

which has prevented her from securing other employment after her termination. Dkt. 33.

Although Plaintiff makes broad allegations that her record has prevented her from securing

other employment, these allegations are not explicit enough to establish a claim for

interference with business expectancy; specifically, Plaintiff does not identify the existence of

valid business expectancy, other than the fact that she has submitted applications with many

potential employers. *See* Dkt. 22 (Plaintiff states that potential employers have likely

contacted the City of Bremerton, which has probably given "poor responses."). The Court

should grant the City Defendants' motion for summary judgment on Plaintiff's second claim

of tortious interference with business expectancy, because Plaintiff failed to meet show a

valid business expectancy.

ORDER Page 26

1

2

*C. Malicious Prosecution*

3
     To maintain an action for malicious prosecution, the claimant must allege and prove

4
(1) that the prosecution claimed to have been malicious was instituted or continued by the

5
defendant; (2) that there was want of probable cause for the institution or continuation of the

6
prosecution; (3) that the proceedings were instituted or continued through malice; (4) that the

7
proceedings terminated on the merits in favor of the plaintiff, or were abandoned; and (5) that

8
the plaintiff suffered injury or damage as a result of the prosecution.  *Peasley v. Puget Sound*

9
*Tug & Barge Co.,* 13 Wn.2d 485, 497, 125 P.2d 681 (1942); see also *Hanson v. City of*

10
*Snohomish*, 121 Wn.2d 552, 558, 852 P.2d 295 (1993). "(M)alice and want of probable cause

11
constitute the gist of a malicious prosecution action," and the burden of proof rests on the

12
plaintiff.  *Hanson*, 121 Wn.2d at 558; *Peasley,* 13 Wn. 2d at 498-99. The method of determining

13
probable cause is

14

15
> If it clearly appears that the defendant, before instituting criminal proceedings
> against the plaintiff, made to the prosecuting attorney a full and fair disclosure, in

16
> good faith, of all the material facts known to him, and that the prosecuting
> attorney thereupon preferred a criminal charge and caused the arrest of the

17
> accused, probable cause is thereby established as a matter of law and operates as a
> complete defense to a subsequent action by the accused. …

18
*Bender v. City of Seattle,* 99 Wn.2d 582*,* 593-94 (1983) *citing Peasley,* 13 Wn. 2d at 499-500,

19

20
     In this case, the City Defendants argue that there is no evidence that the prosecution

21
was instituted or continued by Ms. Woods, Ms. Jankowski, Mr. Elsen or Ms. Babbit. Dkt. 21.

22
Specifically, these defendants argue that they did not know that there would be a criminal

23
prosecution of the Plaintiff or that any information they provided would be turned over to the

24
police during the criminal investigation. Dkt. 21. Although Plaintiff alleges that they were

25
involved in prosecution because "their internet hits on the Superior Court docket records

26

ORDER Page 27

reveal that…they were very interested in the criminal charges against" Plaintiff, curiosity in the proceedings is not sufficient to show that they "instituted or continued" prosecution of the Plaintiff. Dkt. 33.

Although Plaintiff argues that Mr. Lucas and Mr. Williams had more involvement in the criminal charges than the other PW&U employees, it is unclear whether they instituted or continued criminal proceedings against Plaintiff. Specifically, Mr. Lucas provided Detective Harker with a document that compared Plaintiff's hours at the office with the time she worked, and both Mr. Lucas and Mr. Williams were present at the initial meeting with Detective Harker. Dkt. 26.

However, Detective Harker's appears to have made a full and fair disclosure to the Kitsap County Prosecuting Attorney's Office in his Certificate of Probable Cause, because he conducted a reasonable investigation and relied upon the evidence provided to him. *See* Dkt. 26. Although Plaintiff contends that Detective Harker was reckless in that he did not include in his Certificate of Probable Cause Captain Rodger's letter exonerating Plaintiff ten years earlier in the Police Department of similar alleged conduct, Plaintiff offered no evidence that Detective Harker had knowledge of that letter and he appears to have relied in good faith on his interview with Captain Rodgers. Dkt. 45. Detective Harker tried to interview Plaintiff, and it appears that Plaintiff never agreed to an interview, with or without her attorney, with Detective Harker. Dkt. 26. It appears that Detective Harker made a full and fair disclosure of all the material facts known to him. For this reason, there is no want of probable cause to bring criminal charges against Plaintiff and an essential element of this claim is absent. The City Defendants' motion for summary judgment on the issue of malicious prosecution is granted.

ORDER Page 28

*D. Intentional Infliction of Emotional Distress*

To recover under Washington state law for emotional distress inflicted by intentional or reckless conduct, a plaintiff must plead and prove the elements of the tort of outrage. *Keates v. Vancouver*, 73 Wn. App. 257, 263 (1994). The elements of the tort of outrage are (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress. *Dicomes v. State*, 113 Wn.2d 612, 630 (1989). The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Grimsby v. Samson*, 85 Wn.2d 52, 59 (1975) *citing* Restatement (Second) of Torts §46 (1965). "Whether conduct is sufficiently outrageous is ordinarily a question for the jury, but initially it is the responsibility of the court to determine if reasonable minds could differ on whether the conduct was so extreme as to result in liability" *Keates*, 73 Wn. App. at 263 *citing Dicomes*, 113 Wn.2d at 630.

City Defendants contend that Plaintiff cannot make meet the standards for a claim of intentional infliction of emotional distress because the City Defendants' conduct is not "extreme and outrageous" because the City was reasonable in the manner in which it terminated Plaintiff. Dkt. 21; *see Dicomes v. State*, 113 Wn.2d 612, 630 (1989) (when an employer is reasonable in the manner in which it terminates an employee, the court will dismiss the claim.) Plaintiff argues that the City Defendants' conduct was "extreme and outrageous"; specifically, Plaintiff points to the City Defendants' behavior, including (1) City Defendants allegedly repeated false accusations about Plaintiff including that she was dishonest, (2) Mr. Williams allegedly "warned [Plaintiff] what she would face if she didn't capitulate to his demands that she throw her hands up in defeat, pay them money, and go

ORDER Page 29

away quietly," and (3) Plaintiff was publically humiliated by a "perp-walk" through the Kitsap County Superior Courthouse. Dkt. 33.

Although the City Defendants' alleged behavior, if true, is not commendable, it does not meet the threshold of extreme and outrageous behavior that Washington law demands; specifically, the City Defendants' behavior does not go beyond all possible bounds of decency, and reasonable minds would not differ on this issue. Therefore, the Court should grant the City Defendants' motion for summary judgment on the issue of intentional infliction of emotional distress.

*E. Age Discrimination*

The City Defendants seek to dismiss Plaintiff's claim of age discrimination under the Age Discrimination in Employment Act of 1991 ("ADEA"), because she cannot prove that her age was the "but-for" cause of her termination from the City of Bremerton. Dkt. 21.

ADEA 29 U .S.C. § 621, et seq., makes it unlawful for an employer to discriminate against any employee "because of" that individual's age. *Id.* § 623(a). "[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Financial Services, Inc.,* 577 U.S. ----, 129 S.Ct. 2343, 2352 (2009). The Supreme Court held in *Gross* that Title VII's burden-shifting framework does not apply in ADEA cases, because Title VII recognizes mixed motive cases and the ADEA does not. *Id.* at 2348-52.

The Court views the facts in the light most favorable to the nonmoving party, Plaintiff in this case. Plaintiff alleges that Mr. Lucas and Mr. Williams discriminated against her because she was an older woman. Dkt. 33. Plaintiff presents enough evidence to survive

ORDER Page 30

summary judgment on this issue because there is a genuine dispute as to material fact whether Plaintiff's age was the "but-for" cause of her termination. Specifically, Mr. Lucas was involved in the initial investigation into Plaintiff's hours and had requested that other employees keep track of Plaintiff's time in the past, and several witnesses state that Mr. Lucas favored younger women in the Department and appeared to have a vendetta against Plaintiff. *See* Dkt. 34-1, Dkt. 34-2; Dkt. 34-3; and Dkt. 35-1. Furthermore, it is disputed whether Mr. Lucas had some hand in selecting Ms. Woods, a younger female, to ultimately replace Plaintiff. *See* Dkt. 34-3. Because material facts are in dispute, the Court should not grant the City Defendants' motion for summary judgment on this issue.

### *F. Wrongful Discharge*

There are four elements to analyze for a wrongful discharge in violation of public policy claim: (1) the existence of a clear public policy (the clarity element), (2) discouraging the conduct in which Plaintiff engaged would jeopardize the public policy (the jeopardy element), (3) the public-policy-linked conduct caused the dismissal (the causation element), and (4) there must not be an overriding justification for the dismissal (the absence of justification element).  *Gardner v. Loomis Armored, Inc.,* 128 Wn.2d 931, 941 (1996).

Plaintiff alleges that she has a valid claim for wrongful discharge because she was terminated because of her age. Dkt. 33. Washington State recognizes that it is an unfair employment practice to discriminate in employment against an individual who is 40 years of age or older. *See* RCW 49.44.090(1). Because Plaintiff's Wrongful Discharge claim ties to her cause of action under the ADEA, this Court should not grant City Defendants' motion for summary judgment on this issue because issues of fact are disputed.

*G. Extortion*

Plaintiff alleges that City Defendants acting under the color of state law attempted to extort her. Dkt. 1. Although a federal criminal statute, 18 U.S.C. § 1951, criminalizes extortion, there must be a private right of action to enforce the underlying federal statute in order to seek redress under § 1983. *See Keaukaha-Panaewa Comm. V. Hawaiian Homes,* 739 F.2d 1467, 1470-71 (9th Cir. 1984). The federal statute criminalizing extortion does not establish a private right of action on its own. *See* 18 U.S.C. § 1951; *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2nd Cir. 1994).

Plaintiff argues that Washington State has a statute criminalizing extortion, RCW 9A.56.130, which gives the Plaintiff a private cause of action. Dkt. 33. Plaintiff states that

> "[t]he city defendants ignore the fact that the extortion claim is brought as a Sec. 1983 Acting Under Color of State Law Claim. [Plaintiff's] right to bring a civil action over the loss of her job, and the actions of city defendants getting her terminated are a due process property right as set forth in the above section. This is not about an extortion claim on its own, but a civil rights action against Phil Williams and the City."

Dkt. 33.

No private right of action exists under the federal extortion statute alone, and Washington's criminal statute does not appear to establish a private civil right of action. *See* RCW 9A.56.130. Under  Washington's criminal statute, only a government entity can criminally charge Mr. Williams for his alleged statements about repayment. *Id*. It appears that no private civil Washington state law claim exists for extortion because Plaintiff states as much – "[t]his is not about an extortion claim on its own." Dkt. 33. Indeed, Mr. Williams' statements about repayment appear to be an offer of settlement rather than an attempt to extort funds.

ORDER Page 32

For these reasons, Plaintiff's extortion claim against the City Defendants should be dismissed. This Court will analyze Mr. Williams' statements under a separate Due Process analysis.

*H. Due Process*

Plaintiff argues that she was deprived of her liberty interests in future employment without due process. A liberty interest is infringed if (1) "the government dismisses an employee based on a charge that calls into question his good name, honor or integrity", or (2) "if the government imposes a stigma or other disability that forecloses the employee's freedom to take advantage of other employment opportunities." *Giles v. Department of Social & Health Servs.,* 90 Wn.2d 457, 461, 583 P.2d 1213 (1978), *cited in Ritter v. Board of Commr's*, 96 Wn.2d 503, 510, 637 P.2d 940 (1981). Plaintiff contends that she was dismissed on an allegation of dishonesty and that these allegations have foreclosed her freedom to take advantage of other employment opportunities. Dkt. 33.

"A public employee's property interest in continued employment is created and defined by state law, and is protected by the due process clauses of the state and federal constitutions." *Sneed v. Barna*, 80 Wn. App. 843, 849 (1996) *citing Olson v. University of Washington*, 89 Wn.2d 558, 563, 573 P.2d 1308 (1978). The City Defendants do not argue that Plaintiff lacks a property interest in her employment with the City. Dkt. 21; Dkt. 44

Under *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487 (1985), the Due Process Clause requires that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. The Ninth Circuit has stated that the pre-termination hearing does not need to be elaborate, but some kind of hearing must be afforded to the employee prior to termination. *Clements v. Airport Authority of Washoe*

ORDER Page 33

*County*, 69 F.3d 321, 322-23 (9th Cir. 1995) *citing Loudermill,* 470 U.S. at 544-45. The essential elements of this pre-termination hearing must be notice and an opportunity to respond. *Loudermill*, 470 U.S. at 544-45.

Plaintiff argues that she was denied due process because (1) she was not given access to her computer files, (2) she was not given the City's evidence against her, (3) the hearing she was offered was inherently unfair, and (4) the City did not grant her a second continuance of her hearing despite a letter from her physician, which requested that Plaintiff's hearing be delayed for four-weeks in order for Plaintiff's new anti-anxiety medication to take effect. Dkt. 33.  Despite the fact that the continuance was not granted, Plaintiff did not appeal the Notice of Discipline letter dated August 17, 2007. Dkt. 24.

City Defendants respond that Plaintiff had ample opportunity to respond before her termination, either in person or in writing, but she failed to do so. City Defendants state that they were not required by the Due Process Clause to provide Plaintiff with any discovery prior to this hearing. Dkt. 44. Despite that the City did not grant her a continuance, Plaintiff had an opportunity to respond in writing before her termination and declined to respond in writing. Furthermore, Plaintiff did not appeal her Notice of Discipline. Therefore, Plaintiff was afforded the required Due Process before her termination. The Court should grant the City Defendants' Motion for Summary Judgment on the issue of Due Process.

## *I. Retaliation*

In order for a plaintiff to make a prima facie case of retaliation, Plaintiff must show that (1) she was engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) a causal link exists between the protected activity and the adverse

ORDER Page 34

1  action. *Ray v. Henderson,* 217 F.3d 1234, 1240 (9th Cir. 2000) *citing Steiner v. Showboat*

2  *Operating Co.,* 25 F.3d 1459, 1464 (9th Cir. 1994).

3       In this case, Plaintiff argues that her EEOC claim filed in December 2007 was a

4  protected activity. Dkt. 33. Plaintiff argues that the City Defendants retaliated against her by

5  "continuing the criminal proceedings against her." Dkt. 33. City Defendants assert that she

6  fails to make out a prima facie case of retaliation because Plaintiff did not suffer an adverse

7

8  employment action. Specifically, City Defendants argue that Plaintiff's employment was

9  terminated in August 2007 well before she filed her EEOC claim in December. Dkt. 44.

10       On its face a criminal investigation does not appear to be an adverse employment

11  action, and, even if it was, Plaintiff offers no evidence of a causal link between her EEOC

12  complaint and the ongoing criminal proceedings because the City Defendants had no control

13

14  over  the criminal prosecution once it was turned over to the Kitsap County Prosecutor.  For

15  this reason, Plaintiff's retaliation claim against the City Defendants should be dismissed.

16       Therefore, it is hereby, **ORDERED** that City Defendants' Motion for Summary

17  Judgment (Dkt. 21) is **DENIED IN PART** and **GRANTED IN PART** as follows:

18  •   City Defendants' Motion for Summary Judgment on the issue of Defamation is
        **DENIED**,
19  •   City Defendants' Motion for Summary Judgment on the issue of Tortious Interference
        with a Contractual Relationship is **DENIED**,
20  •   City Defendants' Motion for Summary Judgment on the issue of Tortious Interference
        with a Business Expectancy is **GRANTED**,
21  •   City Defendants' Motion for Summary Judgment on is the issue of Malicious
        Prosecution is **GRANTED**,
22  •   City Defendants' Motion for Summary Judgment on the issue of Intentional Infliction
        of Emotional Distress is **GRANTED**,
23  •   City Defendants' Motion for Summary Judgment on the issue of Age Discrimination
        is **DENIED**,
24  •   City Defendants' Motion for Summary Judgment on the issue of Wrongful Discharge
        is **DENIED**,
25

26

ORDER Page 35

- City Defendants' Motion for Summary Judgment on the issue of Extortion is **GRANTED**,
- City Defendants' Motion for Summary Judgment on the issue of Due Process is **GRANTED**,
- City Defendants' Motion for Summary Judgment on the issue of Retaliation is **GRANTED**,
- Plaintiff's claims for Tortious Interference with a Business Expectancy, Malicious Prosecution, Intentional Infliction of Emotional Distress, Extortion, Due Process and Retaliation are **DISMISSED**.
- The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

- Dated this 22nd day of March 2010.

_____
ROBERT J. BRYAN
United States District Judge

ORDER Page 36